4 F.3d 134
 62 Fair Empl.Prac.Cas. (BNA) 1315,
62 Empl. Prac. Dec. P 42,540
Jeannette SAULPAUGH and Gregory M. Saulpaugh, Plaintiffs-Appellants,
v.
MONROE COMMUNITY HOSPITAL, Yvon Rosemond, Individually and
as Former Assistant Administrator of Patient Services and J.
Raymond Diehl, Jr., Individually and as Executive
Administrator, Defendants-Appellees.
 Nos. 1687, 1827, Dockets 93-7122, 93-7204.
 United States Court of Appeals,
Second Circuit.
 Argued June 21, 1993.
Decided Aug. 27, 1993.
 
 Emmelyn Logan-Baldwin, Rochester, NY, for plaintiffs-appellants.
 T. Andrew Brown, Rochester, NY (Charles S. Turner, Co. Atty., of counsel), for defendants-appellees and cross-appellants.
 Before NEWMAN, Chief Judge, VAN GRAAFEILAND, and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiff-appellant Jeannette Saulpaugh appeals from a judgment entered in United States District Court for the Western District of New York (Michael A. Telesca, Judge ), following a bench trial on her claims asserted pursuant to Title VII of the Civil Rights Act of 1964. The district court held defendants liable under Title VII, finding that Saulpaugh had been both sexually harassed and discharged in retaliation for complaining about this harassment. In its calculation of damages and attorneys' fees, the district court did not award the full measure of damages sought.
 
 
 2
 On appeal, Saulpaugh first challenges the district court's dismissal of her claims under 42 U.S.C. Sec. 1983. Saulpaugh and her husband further challenge the district court's dismissal of their claims under New York common law. Finally, Saulpaugh contends that the district court miscalculated in awarding damages and attorneys' fees. Specifically, Saulpaugh argues that the district court: (1) erred in excluding salary for her period of disability from its award of back pay; (2) erred in excluding the value of lost employer retirement contributions that Saulpaugh's expert calculated she had lost; (3) abused its discretion by failing to compound the interest that it awarded her; (4) abused its discretion by failing to award Saulpaugh the equitable remedy of front pay; (5) abused its discretion in adjusting downward the number of attorney hours compensated; and (6) abused its discretion in reducing the hourly rate of attorney compensation below the prevailing market rate. Defendants cross-appeal to challenge the district court's determination that they violated Title VII, contending that the evidence does not support this conclusion.
 
 
 3
 For the reasons set forth below, we affirm that portion of the judgment of the district court finding defendants liable for violating Title VII, but vacate the district court's award of damages, and remand with instructions that the district court recalculate the damages using a compound rate of interest. In addition, we reverse that portion of the district court's judgment dismissing Saulpaugh's equal protection and due process claims asserted under 42 U.S.C. Sec. 1983 as well as the Saulpaughs' claims under New York common law, and remand for further deliberations in light of this opinion. Finally, we affirm the district court's dismissal of Saulpaugh's claim that defendants termination of her employment violated her rights under the First Amendment.
 
 BACKGROUND
 
 4
 Saulpaugh began working at defendant-appellee Monroe Community Hospital (the "Hospital") on December 5, 1983 as the Executive Housekeeper. On September 28, 1984, Saulpaugh's immediate supervisor, defendant-appellee Yvon Rosemond called Saulpaugh into his office and handed her a letter of termination for "unsatisfactory performance." During the intervening nine month period, as more fully developed below, Saulpaugh was subjected to Rosemond's repeated acts of sexual harassment and retaliation.
 
 
 5
 Saulpaugh was making $17,510 a year as of the date of her dismissal. After Saulpaugh's termination, Rosemond reportedly called a nursing home where Saulpaugh had a job offer, and advised the nursing home that Saulpaugh had been fired for her poor performance. The nursing home subsequently rescinded its offer. Saulpaugh was ultimately able to secure employment elsewhere, but at a lower salary and with fewer fringe benefits.
 
 
 6
 On December 23, 1985, Saulpaugh and her husband brought the instant suit against the Hospital, Rosemond, and Raymond Diehl, the Hospital's executive administrator. The Saulpaughs asserted claims under Title VII of the Civil Rights Act, 42 U.S.C. Sec. 1983, and various statutory and common law claims under New York law.
 
 
 7
 On May 14, 1986, the United States District Court for the Western District of New York (Telesca, J.), granted defendants' motion to dismiss the Section 1983 claims for failure to state a claim, and to sever all state claims. The district court reasoned, inter alia, that Saulpaugh's equal protection claim implicated the same facts as her Title VII claim, and, therefore, that her Section 1983 claim was impermissibly grounded solely on a violation of Title VII. The court also concluded that Saulpaugh had failed to assert a viable Section 1983 action for violation of due process, because the alleged abuses of authority were identical to actions which could have been carried out by a private employer. Finally, the district court concluded that in light of its dismissal of the Section 1983 claims, the issues surrounding the New York common law claims would predominate, and accordingly dismissed these claims without prejudice. The Saulpaughs subsequently filed their severed claims in state court. After some discovery on the remaining claims, counsel for both parties agreed to postpone discovery until Saulpaugh's civil service claim was determined. On March 10, 1989, the Appellate Division affirmed the decision of the New York State Supreme Court, finding that defendants had unlawfully terminated Saulpaugh in violation of New York Civil Service Law.
 
 
 8
 After discovery was completed, a bench trial was held in December of 1992 on Saulpaugh's claim under Title VII. Saulpaugh testified at trial that almost immediately after being hired, she began to be sexually harassed by her supervisor, defendant-appellee Rosemond. In fact according to Saulpaugh, on her first day of work, Rosemond greeted Saulpaugh in the presence of other employees with "oh, here is my little rabbit." The most extreme example of Rosemond's harassment of Saulpaugh occurred on December 23, 1983. Saulpaugh recounted that on that day she was called into Rosemond's office after lunch and was asked to go to New York City with him. In response to her declining this invitation, Rosemond stated "I thought you were a liberated woman.... Well, haven't you heard about open marriages?" Saulpaugh asked Rosemond whether he was talking about "cheating here." Rosemond responded that it was not cheating "if one spouse turns their [sic] head."
 
 
 9
 Saulpaugh testified that after she complained to her secretary and another employee supervised by Rosemond about this incident, Rosemond called her to his office where he threatened and berated her. According to Saulpaugh, Rosemond informed her that only he could help her keep her job, for which she had been initially hired as a provisional civil service employee. Saulpaugh recounted at trial that Rosemond also warned her that "I hold the power of your job, if you do one more thing, I will fire you." Notwithstanding this threat, Saulpaugh informed Rosemond's immediate supervisor, Loren Ranaletta, and Reva Riley, the Associate Administrator of Personnel at the Hospital, of Rosemond's actions.
 
 
 10
 Saulpaugh testified at trial that after the incidents of harassment were made public, Rosemond began to retaliate against her by criticizing her performance. Conflicting evidence was introduced at trial regarding Saulpaugh's performance as Executive Housekeeper. Saulpaugh received a number of letters of commendation for her various efforts. However, there were also complaints, primarily but not exclusively lodged by Rosemond, regarding the cleanliness of different areas that Saulpaugh and her staff were responsible for cleaning. Saulpaugh maintained at trial that these complaints constituted retaliation on the part of Rosemond.
 
 
 11
 Rosemond also allegedly retaliated by, among other things, making Saulpaugh punch a time clock, recording and replaying his conversations with Saulpaugh, making Saulpaugh personally inspect the morgue, which she had been promised would not be required, and refusing to approve her request for overtime pay. Saulpaugh complained about some of Rosemond's actions to Ranaletta. Ranaletta ordered Rosemond to discontinue those practices that Saulpaugh complained of. According to Saulpaugh, Rosemond was infuriated by the fact that she had complained to Ranaletta, and subsequently threatened Saulpaugh that if she ever did anything wrong she would be fired.
 
 
 12
 The record indicates that as Saulpaugh and Rosemond's interactions became more hostile, employees in charge of personnel relations became more involved. When confronted by his supervisors, Rosemond denied having ever sexually harassed Saulpaugh. Instead, Rosemond portrayed his dispute with Saulpaugh as being a function of his complaints about her poor performance. Despite both sides' complaints, Rosemond continued to act as Saulpaugh's supervisor. Rosemond also continued to act in a manner that was considered by Saulpaugh to be sexually harassing. For example, Saulpaugh testified that Rosemond placed his arm around her waist on one occasion, purportedly in an effort to help seat her.
 
 
 13
 In addition to the acts of retaliation testified to by Saulpaugh, the district court heard the testimony of Delores Wise, the Executive Housekeeper whom Saulpaugh had replaced. Wise recounted how she had suffered advances made by Rosemond similar to those described by Saulpaugh. According to Wise, Rosemond had repeatedly invited her both to his residence and to New York City, where he said he would "show her a good time." Wise testified that after she rejected Rosemond's repeated advances, he became very critical of her work. Wise indicated that she did not bring a complaint against Rosemond, because she suspected that no one would believe her, and instead she sought and obtained employment elsewhere.
 
 
 14
 At the conclusion of the trial the district court ruled in Saulpaugh's favor, finding that defendants had violated Title VII. Specifically, the court concluded that Rosemond had violated Title VII by sexually harassing Saulpaugh and retaliating against her for complaining about his conduct. The court also found that the Hospital and Diehl, the Hospital's executive administrator, condoned Rosemond's actions by not adequately investigating Saulpaugh's claims.
 
 
 15
 Saulpaugh was awarded $38,282.90 in damages for lost wages between September 28, 1984 and January 1, 1988. The district court excluded from its calculation lost wages after January 1, 1988, because as of that date Saulpaugh has been disabled. Additionally, the court did not include the value of employer retirement contributions, which Saulpaugh's expert calculated that she had lost. The court also calculated interest awarded on a non-compound basis. As a result, Saulpaugh was only awarded 7.22% interest on the total amount of damages. Finally, the district court declined to award Saulpaugh the equitable remedy of front pay.
 
 
 16
 In a decision and order dated March 16, 1993, the district court awarded $85,304.88 of the claimed $157,259.43 in attorneys' fees and costs claimed. The court concluded that some time entries made by Saulpaugh's attorney were inadequate, and that some of the time claimed had not been reasonably expended. The court also employed a lower hourly rate than the established market rate. The court noted that the retainer agreement stated an hourly rate of $80. In addition, because of the delay in litigating the matter, the court looked to the average historic fees over the entire period of the litigation. On this basis, the district court concluded that $110 per hour was a reasonable rate.
 
 
 17
 Saulpaugh now appeals to challenge: (1) the district court's dismissal of her Section 1983 suit; (2) the district court's dismissal of her pendent state claims; (3) the district court's calculation of damages; and (4) the district court's calculation of attorneys' fees. Defendants cross-appeal and challenge the judgment of the district court, which found in favor of Saulpaugh on her Title VII claim.
 
 DISCUSSION
 I. Defendants Liability Under Title VII
 
 18
 Initially, this Court must deal with defendants' cross-claim that the district court erred in finding for Saulpaugh on her claims under Title VII. This contention could have been complicated by the Supreme Court's recent decision in St. Mary's Honor Center v. Hicks, --- U.S. ----, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), which must be applied retroactively pursuant to Harper v. Virginia Dept. of Taxation, --- U.S. ----, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). Under Hicks we would have been required to vacate the judgment had the district court reached its conclusion that Saulpaugh was discharged in retaliation for engaging in a protected activity based solely on her showing that defendants' proffered reason for their actions was false. The Court in Hicks emphasized that a showing by Title VII plaintiffs that their employer's justification was false does not compel a finding of liability. Even after so demonstrating, Title VII plaintiffs retain the ultimate burden of proving that an employer's action was prompted by an impermissible motive. Id. However, Hicks does not impact the instant case because Saulpaugh introduced a substantial amount of direct evidence indicating that Rosemond fired her in retaliation for complaining about his sexual overtures. The district court could and did find this evidence to be credible. Having carefully weighed the evidence, the district court did not clearly err, as defendants contend, in finding that Saulpaugh had met her burden of proving that she had been subjected to a retaliatory action.
 
 
 19
 Section 704(a) of Title VII prohibits an employer from discriminating "against any of his employees ... because [the employee] has opposed any practice made unlawful by this subchapter." 42 U.S.C. Sec. 2000e-3(a) (1988). We note that in the context of a discharge in retaliation for engaging in a protected activity, this Court had developed a test based on the framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), see Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59 (2d Cir.1992); Johnson v. Palma, 931 F.2d 203 (2d Cir.1991), which has now been clarified by Hicks. In applying this test, the district court first concluded that Saulpaugh had established a prima facie case,[1] because she demonstrated "participation in a protected activity known to the defendant, an employment action disadvantaging [her], and a causal connection between the protected activity and the adverse employment action." Kotcher, 957 F.2d at 64 (citations omitted). The court then properly heard and considered the defendants' proffered non-discriminatory reason for their actions. See Johnson, 931 F.2d at 207. Because defendants presented evidence indicating that they had dismissed Saulpaugh due to her poor performance, the court appropriately evaluated whether this justification was merely pretextual, i.e., a pretext for improperly motivated action. See Kotcher, 957 F.2d at 64-65. The district court's finding that Saulpaugh performed well in her capacity as Executive Housekeeper, and that defendants' justification for her dismissal was pretextual, is amply supported by the record.
 
 
 20
 As noted above, had the district court stopped its analysis short of this point and reached its conclusion that Saulpaugh was subjected to a retaliatory discharge based simply on her demonstration that the defendants' excuse was false, we would have been forced to vacate the judgment and remand in light of Hicks. In the instant case, however, the district court credited Saulpaugh's testimony that Rosemond threatened to fire her if she complained further about his actions. Furthermore, the court intimated that Saulpaugh's credibility was bolstered by the testimony of Wise, the former Executive Housekeeper, who described a similar pattern of sexual harassment and retaliation. Saulpaugh in effect produced not one but two "smoking guns." Therefore, we find that Saulpaugh unquestionably satisfied her burden of proving that she was discharged in retaliation for complaining about Rosemond's harassment.
 
 
 21
 We emphasize that despite the dire warnings to the contrary, Justice Scalia soundly concluded that Hicks would not cause "[p]anic ... [to] break out among the courts of appeals." --- U.S. at ----, 113 S.Ct. at 2750. We read Hicks as doing no more than reiterating the longstanding rule that despite shifting burdens of production, a plaintiff always shoulders the ultimate burden of proof. As carefully explained by Justice Scalia in Hicks, once a Title VII plaintiff has established his or her prima facie case, the burden of production shifts to the defendant to provide a non-discriminatory rationale for its action. Because of the presumption attached to the establishment of a prima facie case in this area of jurisprudence, the failure of a defendant to meet its burden of production would result in a directed verdict for the plaintiff. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980). However, if a defendant carries its burden by producing a non-discriminatory motive, "the McDonnell Douglas framework--with its presumptions and burdens--is no longer relevant." Hicks, --- U.S. at ----, 113 S.Ct. at 2745. Instead, the question simply becomes whether the plaintiff has proven its case by a preponderance of the evidence. In some instances, as Justice Scalia notes, a plaintiff may meet this ultimate burden of proof by combining her proof of the elements constituting a prima facie case with evidence that defendant's proffered reasons for its acts were false. --- U.S. at ----, 113 S.Ct. at 2749. Justice Scalia emphasizes that a factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases. Id. We were not required to evaluate whether this was such a case, because Saulpaugh, in addition to demonstrating the falsity of defendants' rationale, produced direct evidence of defendants' discriminatory intent. Nevertheless, because of the ill-founded confusion that has surrounded Hicks ' pronouncements, we believe it important to emphasize that a Title VII plaintiff does not necessarily meet its burden of persuasion by convincing the factfinder that the employer's non-discriminatory explanation is not credible; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence. Id. A Title VII plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. Because Saulpaugh succeeded in doing both, the district court unquestionably was justified in finding that Saulpaugh had proven her case by a fair preponderance of the evidence.
 
 
 22
 Likewise, the district court correctly outlined and applied the legal standard for Saulpaugh's "quid pro quo" theory of sexual harassment. As the district court noted, " '[u]nder a quid pro quo theory, the plaintiff-employee must establish that she was denied an economic benefit either because of gender or because a sexual advance was made by a supervisor and rejected by her.' " (quoting Kotcher, 957 F.2d at 62). The district court then concluded that, "[a]fter carefully considering and evaluating the credibility of the witnesses' trial testimony, I have determined that plaintiff has established that her rejection of Rosemond's sexual advances resulted in the deprivation of a job benefit for which she was otherwise qualified, i.e. a fair evaluation of her work." Accordingly, the Hospital as Rosemond's employer was held strictly liable for Rosemond's actions. See Carrero v. New York City Hous. Auth., 890 F.2d 569, 579 (2d Cir.1989). Essentially defendants are asking this Court to substitute our evaluation for that of the trier of fact. We decline this invitation.
 
 II. Section 1983 Action
 
 23
 Saulpaugh next argues that the district court erred in dismissing her Section 1983 claim. According to Saulpaugh, her claims under Title VII and under Section 1983 were separate and distinct. The district court, relying on Day v. Wayne County Bd. of Auditors, 749 F.2d 1199 (6th Cir.1984), concluded that Title VII provided Saulpaugh with her exclusive remedy, because her Section 1983 cause of action was based solely on a violation of Title VII. However, Saulpaugh contends that her claims under Section 1983 are grounded not on Title VII but on defendants' violations of her rights under the First Amendment, the Equal Protection Clause, and the Due Process Clause of the Fourteenth Amendment. Because a Title VII plaintiff can assert claims under Section 1983 for violations of rights not exclusively protected by Title VII, we will discuss each alleged violation in turn.
 
 
 24
 As we noted in Carrero, "it has been assumed in this Circuit that a Sec. 1983 claim is not precluded by a concurrent Title VII claim, when the former is based on substantive rights distinct from Title VII." 890 F.2d at 576; see also Berl v. County of Westchester, 849 F.2d 712 (2d Cir.1988) (remanding Section 1983 and Title VII action for trial). A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant, see Day, 749 F.2d at 1204, but a plaintiff can assert a claim under Section 1983 if some law other than Title VII is the source of the right alleged to have been denied. See Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1575-76 (5th Cir.), cert. denied, 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1989). In the instant case Saulpaugh couches her Section 1983 in terms of the First Amendment, the Equal Protection Clause, and the Due Process Clause. Therefore, if she has asserted cognizable violations of these Constitutional provisions, the district court's dismissal of these claims must be vacated and the case remanded to the district court.
 
 
 25
 Initially, we note that Saulpaugh has failed to state a claim under the First Amendment. According to the Supreme Court in Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983), "when an employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Had Saulpaugh's complaints to her supervisors implicated system-wide discrimination they would have unquestionably involved a matter of "public concern." See Marshall v. Allen, 984 F.2d 787 (7th Cir.1993) (allowing Section 1983 claim where plaintiff was discharged following his support of other employees who had filed suit for gender discrimination); Wilson v. UT Health Ctr., 973 F.2d 1263, 1266 (5th Cir.1992) (upholding Section 1983 claim where plaintiff's complaints concerned the routine use of sexually suggestive language by police officers toward all female officers as well as systemic instances of other forms of sexual harassment), cert. denied, --- U.S. ----, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir.1990) (in banc) (finding public interest where there was a "wholesale change in the highest police echelons allegedly only on a racial basis"), cert. denied, --- U.S. ----, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). Here, however, there has been no violation of the First Amendment, because Saulpaugh's complaints were "personal in nature and generally related to her own situation." Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir.) (holding that resident's complaints about aspects of residency program that negatively affected her did not implicate matters of public concern), cert. denied, --- U.S. ----, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). In the instant case there is no indication that the plaintiff "wanted to debate issues of sex discrimination," that her suit sought "relief against pervasive or systemic misconduct by a public agency or public officials," or that her suit was "part of an overall effort ... to correct allegedly unlawful practices or bring them to public attention." Yatvin v. Madison Metro. School Dist., 840 F.2d 412, 420 (7th Cir.1988) (holding that plaintiff had failed to state a claim for relief under Section 1983). Although evidence was subsequently uncovered that Rosemond had also sexually harassed a prior employee, Saulpaugh's complaints, like those of the plaintiffs in Ezekwo and Yatvin, were motivated by and dealt with her individual employment situation. See also Altman v. Hurst, 734 F.2d 1240, 1244 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984).
 
 
 26
 By contrast, Saulpaugh has properly grounded a Section 1983 claim on the Equal Protection Clause. This Court, like our sister circuits, has upheld a Section 1983 claim against a public official for improper sexual conduct toward an employee that created a hostile work environment. See Carrero, 890 F.2d at 577; see also Andrews v. City of Philadelphia, 895 F.2d 1469, 1478-79 (3d Cir.1990); Starrett v. Wadley, 876 F.2d 808, 814 (10th Cir.1989); Headley v. Bacon, 828 F.2d 1272, 1274-75 (8th Cir.1987); Bohen v. City of East Chicago, 799 F.2d 1180, 1185 (7th Cir.1986). Perhaps some public employers sexually harass both men and women, but until an employer has the audacity to advance such a defense, sexual harassment of women constitutes disparate treatment because of gender, and is actionable under Section 1983.
 
 
 27
 Likewise, Saulpaugh's assertions that defendants deprived her of both a property and a liberty interest without due process of law were sufficient to survive defendants' motion to dismiss. Saulpaugh was terminated on September 28, 1984, almost six months before the Supreme Court's decision in Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) was handed down. As this Court explained in Zinker v. Doty, 907 F.2d 357, 360-61 (2d Cir.1990), cert. denied, 498 U.S. 1041, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), a pre-termination hearing in connection with a dismissal of a public employee was not required prior to Loudermill by the due process clause of the United States Constitution. Id. at 360-63. Nevertheless, if Saulpaugh's probationary status gives rise to a property interest, then her post-termination remedies may have been constitutionally deficient at least as of the date of her termination. We leave this question for decision in the district court in the first instance, perhaps on motion for summary judgment unless factual issues require resolution by a jury.
 
 
 28
 As to Saulpaugh's liberty interest, it is unclear from her amended complaint and her affidavit in opposition to defendants' motion to dismiss exactly when the comments concerning her performance were made to a prospective employer. Paul v. Davis, 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976) and its progeny makes clear that in order for public employees to assert cognizable violations of their liberty interest, the defamation complained of must occur "in the course of the termination of employment." See, e.g., Easton v. Sundram, 947 F.2d 1011, 1016 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992); Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.), cert. denied, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). If statements to prospective employers were made after Saulpaugh's termination, then that defamation was "merely a tort, cognizable at state law, but not a constitutional deprivation." Neu, 869 F.2d at 667. However, given the procedural context of this case, we must construe any disputed or unknown facts in Saulpaugh's favor. We therefore vacate the district court's dismissal of this claim and remand to the district court for a determination of whether Saulpaugh's right to liberty under the Due Process clause has been violated.
 
 III. The State Claims
 
 29
 The district court dismissed the Saulpaughs' state claims primarily because it had already dismissed the claims asserted under Section 1983. Given our reinstatement of most of these latter claims, we believe it appropriate to also reinstate the state claims asserted by the Saulpaughs. However, in so doing we recognize that arguments based on collateral estoppel or res judicata may be available to either side.
 
 IV. Calculation of Title VII Damages
 
 30
 Saulpaugh next contends that the district court erred in calculating the damages it awarded her. Specifically, Saulpaugh argues that the district court: (1) erred in excluding salary for her period of disability from its award of back pay; (2) erred in excluding the value of lost employer retirement contributions; (3) abused its discretion by failing to compound the interest that it awarded her; and (4) abused its discretion by failing to award Saulpaugh the equitable remedy of front pay. We will address each of these contentions in turn.
 
 
 31
 Given Saulpaugh's success on her claim for retaliatory discharge, she would ordinarily be entitled to an award of back pay from the date of her termination until the date of judgment. See Dunlap-McCuller v. The Riese Organization, 980 F.2d 153, 159 (2d Cir.1992). The purpose of back pay is to "completely redress the economic injury the plaintiff has suffered as a result of discrimination." See Gutzwiller v. Fenik, 860 F.2d 1317, 1333 (6th Cir.1988); see also Sellers v. Delgado Community College, 839 F.2d 1132, 1126 (5th Cir.1988) (holding that a back pay award should make injured parties whole by placing them in the position that they would have been "but for" the discrimination). This award should therefore consist of lost salary, including anticipated raises, and fringe benefits. Id.
 
 
 32
 The district court nevertheless excluded from its award the differential in Saulpaugh's salary from 1988 on, because she has been disabled since that date, and would not have been able to work at the Hospital. Saulpaugh argues that as the wrongdoer, the Hospital should bear the risk of her injury. However, Saulpaugh is only entitled to losses suffered "as a result" of defendants' discrimination. See Gutzwiller, 860 F.2d at 1333. Because Saulpaugh would not have been entitled to her salary from the Hospital while disabled, her losses after 1988 were not the result of the discrimination that she suffered. See EEOC v. Independent Stave Co., Inc., 754 F.Supp. 713, 721 (E.D.Mo.1991) (awarding back pay from the date of discharge until date of disability). Likewise, Saulpaugh is not entitled to retirement benefits, because her benefits would not have vested before she became disabled.
 
 
 33
 Title VII authorizes a district court to grant pre-judgment interest on a back pay award. See, e.g., Clarke v. Frank, 960 F.2d 1146, 1153-54 (2d Cir.1992). Its purpose is to prevent an employer from attempting "to enjoy an interest-free loan for as long as it can delay paying out back wages." Id. at 1154 (citation omitted). Therefore, this Court has held that "it is ordinarily an abuse of discretion not to include pre-judgment interest in a back-pay award." Id. (emphasis in original). Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded. For example, if the average interest rate from Saulpaugh's discharge until her award was 7.22% a year, not an unreasonable estimate, then a $1 loss in 1985 would be worth approximately $1.83 in the beginning of 1993. By awarding Saulpaugh the equivalent of only $1.07, the district court was not making her whole and was instead effectively giving the defendants an interest free loan except for one year's worth of interest. Because the district court did not make Saulpaugh whole, its failure to apply a compound rate of interest to its calculation of damages constituted an abuse of discretion. See Clarke, 960 F.2d at 1153. On remand, however, the district court may wish to deny interest for specific years if it concludes that a delay in the litigation was the result of dilatory tactics by the plaintiff. We leave this determination to the district court in the first instance.
 
 
 34
 Finally, the district court did not abuse its discretion in denying Saulpaugh the remedy of front pay. The award of front pay is discretionary, and where as here the district court makes a specific finding that an award of back pay was sufficient to make a plaintiff whole, no abuse of discretion can be found. Cf. Barbano v. Madison County, 922 F.2d 139, 147 (2d Cir.1990) (holding that failure to award front pay, because the district court impliedly found that other relief was sufficient, did not constitute an abuse of discretion).
 
 V. Reasonable Attorneys' Fees
 
 35
 Saulpaugh next argues that the district court erred in calculating reasonable attorneys' fees. The district court awarded $85,304.88 of the $157,259.43 in attorneys' fees and costs claimed. Saulpaugh argues that the district court abused its discretion in adjusting downward the number of hours expended as well as reducing the rate of compensation. We disagree.
 
 
 36
 The calculation of reasonable attorneys fees is a factual issue whose resolution is committed to the discretion of the district court. See Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir.1992). In determining the proper amount of attorneys' fees a district court must multiply "all reasonable hours expended" by "a reasonable hourly rate." Id. (citations omitted). The district court did just that.
 
 
 37
 In a written opinion the district court provided an extensive justification for its reduction of the hours claimed. The court concluded that some time entries were inadequate, particularly because they did not differentiate between time spent on the state and federal cases, and that some time was not reasonably expended given the nature of Saulpaugh's suit. This factual determination is a reasonable one, and consequently we hold that the district court did not abuse its discretion in finding that some of the hours claimed were not reasonably expended. In any event, Saulpaugh's attorney may be entitled to a portion of these excluded fees at the conclusion of the further deliberations that we have ordered.
 
 
 38
 The court also employed a lower hourly rate than the established market rate for the time period in which the work was done. Saulpaugh's attorney presented evidence that the applicable market rate was at least $150 per hour until July 15, 1990, and $185 per hour thereafter. The court rejected this argument and chose instead to employ a rate of $110 per hour. The court noted that the retainer agreement stated an hourly rate of $80, and that the delay in litigating the matter was what caused the market rate to approximately double. Consequently, the court looked instead to the retainer agreement as well as to an average of the historic fees over the period. It was on this basis that the district court concluded that $110 per hour was a reasonable rate. This determination was a sensible one.
 
 
 39
 Because this litigation spanned a number of years, it was appropriate for the court to calculate and apply an average historic market rate for the period in question. See New York Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1153 (2d Cir.1983). In making this calculation the district court was correct in first looking to the retainer agreement as evidence of the appropriate historic market rate at the start of the litigation. See, e.g., Barcia v. Sitkin, 683 F.Supp. 353, 357 (S.D.N.Y.1988) (noting that in determining a reasonable hourly rate the court should initially examine an attorney's existing schedule of fees). The district court then computed an average historic rate in order to avoid awarding Saulpaugh's attorney a windfall due to the protracted nature of the litigation. See Carey, 711 F.2d at 1153. We conclude that the district court did not abuse its discretion in so doing. We have examined Saulpaugh's remaining contentions and find them to be without merit.
 
 CONCLUSION
 
 40
 Based on the foregoing, we affirm that portion of the judgment of the district court finding defendants liable for violating Title VII, but vacate the district court's award of damages, and remand with instructions that the district court recalculate the damages using a compound rate of interest. However, we reverse that portion of the district court's judgment dismissing Saulpaugh's equal protection and due process claims asserted under 42 U.S.C. Sec. 1983 as well as the Saulpaughs' claims under New York common law, and remand for further deliberations in light of this opinion. Finally, we affirm the district court's dismissal of Saulpaugh's claim, asserted pursuant to Section 1983, that defendants termination of her employment violated her rights under the First Amendment.
 
 JON O. NEWMAN, Chief Judge, concurring:
 
 41
 I concur in Judge Altimari's opinion and write separately to amplify my views on appellant's First Amendment claim. I believe that this Circuit's law concerning the First Amendment rights of public employees has evolved too hastily and too narrowly, but I am bound by the precedential force of Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991).
 
 
 42
 With respect to the speech of public employees, the Supreme Court has distinguished between speech on matters of "public concern" and speech on matters of "personal interest." See Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); see also Pickering v. Board of Education, 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968). Adverse employment action taken because of speech in the "public concern" category is actionable under the First Amendment whenever " 'the interests of the [employee], as a citizen, in commenting upon matters of public concern' " outweigh " 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Connick, 461 U.S. at 142, 103 S.Ct. at 1687 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35). Matters of "personal interest," however, require no First Amendment protection beyond whatever limited protection is available to those who are not publicly employed. Id. 461 U.S. at 147, 103 S.Ct. at 1690.
 
 
 43
 This bifurcation has created the issue of whether the speech of a public employee must be placed in either the "public concern" or the "personal interest" categories, or whether, in an appropriate case, it may be placed in both categories, drawing First Amendment protection to the extent that the speech is a matter of "public concern." The Fifth Circuit has ruled that a public employee's speech may fall into both of the Connick categories. In Wilson v. UT Health Center, 973 F.2d 1263 (5th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993), the Court said that the Supreme Court in Connick had "removed from First Amendment protection only that speech that is made only as an employee, and left intact protection for speech that is made both as an employee and as a citizen."[1] Id. at 1269 (emphasis in original). The Seventh Circuit can be understood to take a contrary view. It apparently believes that a public employee's speech must be placed either in the "public concern" category or the "private interest" category. See Marshall v. Allen, 984 F.2d 787, 794-97 (7th Cir.1993) (public concern); Auriemma v. Rice, 910 F.2d 1449, 1459-61 (7th Cir.1990) (in banc) (same), cert. denied, --- U.S. ----, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991); Yatvin v. Madison Metropolitan School District, 840 F.2d 412, 419-20 (7th Cir.1988) (personal interest); Altman v. Hurst, 734 F.2d 1240, 1243-44 (7th Cir.) (same), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984).
 
 
 44
 I think the Fifth Circuit's reading of Connick is correct. In describing the category of "private interest" matters that do not receive First Amendment protection, the Supreme Court was careful to limit its ruling to "ordinary dismissals from government service which violate no ... applicable statute." Connick, 461 U.S. at 146, 103 S.Ct. at 1690. A dismissal in violation of Title VII is a matter of "public concern," and an employee who protests that her discharge violates Title VII is speaking about both a matter of "public concern" and a matter of "private interest."
 
 
 45
 Nevertheless, I am obliged to acknowledge that our Circuit has adopted the position taken by the Seventh Circuit, albeit without explicitly recognizing the two lines of conflicting authority, much less articulating a basis for preferring the Seventh Circuit's conclusion. See Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d at 780-81. Ezekwo ruled that a public employee's speech is to be placed either in the "public concern" or the "private interest" category and that the determination would be based on the "primary aim" of the speech. Id. at 781. No explicit consideration was given to the contention that Ezekwo's speech, complaining of discrimination on the basis of gender, race, and national origin, see id. at 778, should have been deemed a matter of "public concern" simply because the discrimination "violate[d an] applicable statute," Connick, 461 U.S. at 146, 103 S.Ct. at 1690.
 
 
 46
 Though regretting our narrow view of First Amendment protection, I am bound by Ezekwo and therefore concur in the Court's opinion.
 
 VAN GRAAFEILAND, Circuit Judge, concurring:
 
 47
 Because I agree with most of what Judge Altimari has written, I am reluctant to add to the Jarndyce v. Jarndyce aspect of this much overtried case by filing a third appellate opinion. However, I have a few thoughts concerning this matter which I believe should be expressed.
 
 
 48
 At the outset, I must express a reservation concerning my colleague's blanket statement that sexual harassment of women constitutes disparate treatment because of gender. There is a widespread public misconception that only women are entitled to freedom from sexual harassment. This is not so. Women are entitled to no more equal protection under the Constitution than are men. According to a May 21, 1993 article in the New York Times, EEOC records show that in 1992, 968 sexual harassment claims were filed by men. Moreover, harassment is harassment regardless of whether it is caused by a member of the same or opposite sex. I therefore would be more comfortable treating harassment as a violation of Title VII based on hostile work environment rather than section 1983. However, it is not my prerogative to overrule established precedent, and I therefore agree that the case must be returned to the district court for further proceedings. The several paragraphs that follow are intended to unravel somewhat the legal skein we now return to the busy district judge.
 
 
 49
 At the outset, I believe we can state now that the district court should not be required to resume jurisdiction of the state claims. Plaintiffs' 171-paragraph amended complaint contained nine causes of action, only the first two of which alleged federal wrongs, i.e., Title VII and section 1983. The remaining counts all involved state claims and requested, among other things, a declaration that the defendants' acts violated state statutory and common law, together with injunctive relief in favor of Jeannette Saulpaugh and others similarly situated and a specific injunction prohibiting the making of false statements regarding Jeannette Saulpaugh's employment. The district court dismissed the state claims without prejudice on the ground that they would "substantially predominate in terms of proof, the scope of issues raised and comprehensiveness of the remedy sought."
 
 
 50
 Plaintiffs promptly turned to the state courts with a 117-paragraph complaint in which they repeated the claims that the district court had dismissed. New York Supreme Court Justice Robert Wagner summarized the contents of the state complaint as follows:
 
 
 51
 In this action the plaintiffs allege nine causes of action which are, (1) Human Rights Law violations, (2) breach of employment contract, (3) libel and slander, (4) intentional infliction of mental distress, (5) prima facie tort, (6) loss of consortium, (7) violations of the New York Civil Service Law, local Civil Service Commission rules, (8) violation of the New York State Constitution, and (9) [improperly designated 10] violation of Monroe Community Hospital disciplinary rules.
 
 
 52
 Justice Wagner then granted the defense motion to dismiss the claims for breach of contract, libel and slander, emotional distress, prima facie tort, violation of the New York State Constitution, and violation of the Hospital's disciplinary rules. No appeal was taken from these dismissals.
 
 
 53
 Justice Wagner converted the claim for violation of the New York Civil Service Law and the Monroe County Civil Service Commission rules into an Article 78 proceeding under New York law. Thereafter, New York Supreme Court Justice Harold Galloway granted plaintiffs' motion for partial summary judgment based on a violation of Monroe County Civil Service Commission Rule XVI, which provides that a probationary employee such as Saulpaugh is entitled to a minimum eight-week probationary term. On the basis of this determination, Justice Galloway held that Saulpaugh was entitled to be reinstated for a period of five weeks, i.e., the equivalent of the remainder of her eight-week probationary period that followed her discharge. Upon appeal, the Appellate Division Fourth Department held that, because a probationary employee was entitled to only a two-week minimum notice of termination, Saulpaugh was entitled to be reinstated for only two weeks. 148 A.D.2d 928, 539 N.Y.S.2d 165 (4th Dep't 1989). The state courts did not rule on Saulpaugh's federal constitutional claims. They did, however, rule on Saulpaugh's state claims. As to the latter, appellants have had their day in court.
 
 
 54
 I believe that the district court did not abuse its discretion in declining to exercise pendant jurisdiction over the state claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 348-50, 108 S.Ct. 614, 617-19, 98 L.Ed.2d 720 (1988); Owen Equipment and Erection Co. v. Kroger, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978); Gentile v. Wallen, 562 F.2d 193, 198 (2d Cir.1977). Assuming only for the sake of argument that there was an abuse of discretion, appellants have spent three years in litigating their state court claims and should not now be permitted to relitigate them in federal court. It goes without saying that, if appellants had been more successful in their state court litigation, they would oppose any claim that the district court abused its discretion in refusing to exercise pendant jurisdiction.
 
 
 55
 I believe that Saulpaugh's claim of a violation of her liberty interest, based upon hearsay testimony concerning statements allegedly made to the Hurlbut Nursing Home, see, supra, at 143-44, also can be disposed of now. On this point, I am enlightened by that portion of Saulpaugh's cause of action for alleged libel and slander, which is the state equivalent of her federal liberty interest claim. Exhibit F, attached to and made a part of plaintiffs' state complaint, is an "EMPLOYEE REFERENCE INQUIRY" from Hurlbut Nursing Home, dated October 5, 1984 and directed to Monroe County Hospital. The INQUIRY, which stated that Jeannette Saulpaugh "has applied to us for a position," contained numerous blank squares in which the Hospital "as a former employer" was requested to check its response to various inquiries concerning Saulpaugh's work as an employee. The only block that the Hospital checked dealt with "Absenteeism," the response to which could be "High," "Average," or "Low." The Hospital checked the blank labeled "Average." The third cause of action in the state complaint alleges in part that the defendants:
 
 
 56
 maliciously spoke and published of and concerning plaintiff Jeannette Saulpaugh, the following false and defamatory words:
 
 
 57
 A written employment reference falsely stating that plaintiff Jeannette Saulpaugh's attendance had only been average. A copy is attached as Exhibit F.
 
 
 58
 The words published by the defendants were published with the intent to injure plaintiff Jeannette Saulpaugh in her profession, reputation and standing in the community. The words were and are wholly false.
 
 
 59
 I quote this allegation not to demonstrate its speciousness, but to demonstrate that, as of October 5, 1984, one week after Saulpaugh's employment was terminated, Hurlbut Nursing Home still considered her an applicant for employment and was seeking information from the Hospital as a "former employer." Accepting as true Saulpaugh's hearsay testimony that Rosemond orally expressed to Hurlbut his dissatisfaction with her work, such statement could not be considered a constitutional violation of her liberty interest. See Paul v. Davis, 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.), cert. denied, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).
 
 
 60
 Finally, although I agree with my colleagues that the district court should give further consideration to the amount of the award for prejudgment interest, I want to make clear my belief that interest should not be awarded for those substantial periods of delay caused by the plaintiffs themselves. See Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 109 (2d Cir.1992); Cotter v. Eastern Conference of Teamsters Retirement Plan, 898 F.2d 424, 429 (4th Cir.1990). In this respect, the following finding of the district court is most significant:
 
 
 61
 This action has been pending since 1985 and for a period of five years virtually no action took place. It was not until October 28, 1991, when this Court issued an Order to Show Cause why the case should not be dismissed for failure to prosecute, that this case eventually developed momentum.
 
 
 62
 The court added a footnote to the effect that plaintiffs' attorney spent 4.4 hours on the case in 1987, 5.9 hours in 1988, 2.3 hours in 1989, 27 minutes in 1990, and 11.9 hours in 1991.
 
 
 63
 I do not believe my colleagues intend that plaintiffs should be awarded prejudgment interest for this period of time. If they do, I respectfully disagree.
 
 
 
 [1]
 "A prima facie case consists of sufficient evidence in the type of case to get plaintiff past a motion for directed verdict in a jury case or motion to dismiss in a nonjury case; it is the evidence necessary to require [a] defendant to proceed with his case. Courts use [the] concept of "prima facie" case in two senses: (1) in [the] sense of plaintiff producing evidence sufficient to render reasonable a conclusion in favor of [the] allegation he asserts; and (2) courts used "prima facie" to mean not only that plaintiff's evidence would reasonably allow [the] conclusion plaintiff seeks, but also that plaintiff's evidence compels such a conclusion if the defendant produces no evidence to rebut it." Black's Law Dictionary 1071 (5th ed. 1979) (citations omitted)
 
 
 [1]
 Though some of the plaintiff's speech in Wilson concerned violations of Title VII directed at other persons, it is evident that the Fifth Circuit, properly in my view, regarded even her speech concerning the misconduct directed solely at herself as within the "public concern" category:
 We think that Wilson made her reports of sexual harassment both as a citizen and an employee. She contends that she started her reports after personally experiencing considerable harassment, and obviously had a stake as an individual citizen in having that conduct stopped....
 Wilson, 973 F.2d at 1269-70 (emphasis added).