**Joanne YATVIN, Plaintiff–Appellant,**

v.

**MADISON METROPOLITAN SCHOOL DISTRICT, a political subdivision of the City of Madison, et al., Defendants–Appellees.**

**No. 87–1462.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1987.

Decided Feb. 5, 1988.

---

David E. Lasker, Buffett, Dew, Blaney, Olson & Lasker, Madison, Wis., for plaintiff-appellant.

Gerald C. Kops, Isaksen, Lathrop, Esch, Hart & Clark, Madison, Wis., for defendants-appellees.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

Joanne Yatvin, the principal of a public school in Wisconsin, brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, against a variety of public agencies and officials, complaining that the denial of two promotions that she sought violated her rights under Title VII and the Fourteenth Amendment. She lost, and appeals.

In 1983 Yatvin had applied for the position of Assistant Superintendent of Instruction for the Madison school district. Three men also applied. A committee interviewed all four but recommended only two

(both of them men) to the hiring authority, Donald Hafeman, the superintendent of the school district. He picked Jerry Patterson, prompting Yatvin to file charges of sex discrimination with the relevant state and federal agencies. Shortly afterward she applied for the position of Director of Curriculum and Staff Development for the Madison school district. Again there were four applicants. After being interviewed, all were recommended to Hafeman, who delegated the hiring decision to Patterson, who after interviewing the four applicants chose a woman for the job—but not Yatvin. She claims that she was turned down the first time because she was a woman and the second time in retaliation for her action in filing sex discrimination charges growing out of her first application.

The judge ruled that Yatvin was entitled to a jury trial on her claim that the denial of her first application violated the equal protection clause of the Fourteenth Amendment, but not on her claim of retaliation, for he rejected her argument that retaliation for the filing of sex discrimination charges violates the Constitution rather than just Title VII, which confers no right to a jury trial. Nevertheless the judge submitted both of Yatvin's Title VII claims (sex discrimination for the first turn-down and retaliation for the second) to the jury, but for advice only, not decision. The jury brought in a verdict for the defendants on sex discrimination (both the claim under the equal protection clause and the claim under Title VII), but a verdict for Yatvin on retaliation. The judge then made his own findings of fact and conclusions of law on retaliation; finding no retaliation and thus rejecting the jury's advisory verdict, he entered judgment for the defendants on all counts.

■ When Yatvin applied for the job of Assistant Superintendent of Instruction, the Madison school district had an affirmative action plan which provided that "in cases where the position to be filled is for a job classification where a particular protected group is under-utilized or under-represented, if a member of the under-utilized or under-represented groups is as qualified

as the other candidate(s), the member of the under-utilized or underrepresented group shall be offered the position." Yatvin contends that the defendants violated this provision by appointing Patterson, a white male, rather than her, the only female applicant, and that by violating it they discriminated against her on grounds of sex, contrary to the equal protection clause and to Title VII. The argument has two fatal flaws. First, the affirmative action plan was not violated. It awards the job to the applicant from the favored group only in the event of a tie, and there was no tie. The interview committee, composed of five men and three women, ranked Yatvin third out of four and forwarded to Hafeman only the two highest-ranked applicants, who had each received almost twice as many points as Yatvin.

■ In any event, the breach of a promise to give women favored treatment is not sex discrimination. Sex discrimination is treating a person worse because of her (or his) sex; it is not refusing to discriminate in favor of a person on grounds of her sex. See *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1084 (7th Cir.1987) (race). The Constitution and Title VII have been held, with exceptions irrelevant here, to permit affirmative action; they do not require it. See, e.g., *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1097, 67 L.Ed.2d 207 (1981). Granted, just as the establishment of a bona fide affirmative action plan might help rebut a claim of sex discrimination, see *Coser v. Moore*, 739 F.2d 746, 751 (2d Cir.1984), so the violation of such a plan might help support such a claim, see, e.g., *id.* at 751; *Craik v. Minnesota State University Bd.*, 731 F.2d 465, 472 (8th Cir.1984); *Chang v. University of Rhode Island*, 606 F.Supp. 1161, 1183–84 (D.R.I.1985). Although we have found no case where such evidence played a significant role, we can imagine one. Suppose that a plan favoring women were adopted in settlement of a sex discrimination case and the defendant refused to follow the plan even though it had honored the commitments made in settlement of all its other cases; an inference of sex discrim-

ination might arise from the violation of the affirmative action plan in those circumstances. Cf. *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Yet even then, the violation of the plan would not be sex discrimination as such. We therefore disagree with the suggestion in *Morman v. John Hancock Mutual Life Ins. Co.*, 672 F.Supp. 993, 995 (E.D.Mich.1987), that if an employer uses an affirmative action plan as a "shield from claims of discrimination, employees arguably protected by the plan can use it as a sword to challenge the propriety of their treatment" (footnote omitted)—if what this means is that a violation of the plan is a violation of Title VII rather than just possible evidence of such a violation.

■ And where there is substantial compliance with an affirmative action plan, occasional departures have no evidentiary significance at all. Cf. *Coser v. Moore*, *supra*, 739 F.2d at 751; *Gray v. University of Arkansas*, 658 F.Supp. 709, 726–27 (W.D.Ark.1987). The adoption of such plans would be discouraged if failure to achieve perfect compliance with them were treated as evidence of discrimination. The response in *Morman* to this argument— "then so be it," 672 F.Supp. at 997—is not compelling.

■ If the plan in this case is deemed a part of Yatvin's employment contract, then by analogy to cases such as *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987), which find implicit contractual entitlements in handbooks given employees by their employers containing rules of employment, Yatvin could argue that as long as the plan was in force and she satisfied its requirements the defendants broke their contract with her by refusing to appoint her. She would then have a pendent claim for breach of contract under state law. But she makes no such pendent claim. She does argue that by breaking the implied contract to give her favorable consideration, the defendants not only violated the equal protection clause and Title VII but also deprived her of property without due process of law, in violation of the due pro-

cess clause of the Fourteenth Amendment. But this argument has a multiplicity of flaws. For one thing, it comes too late, having been raised for the first time on appeal; for another, it assumes contrary to fact that she satisfied the condition in the plan that she be as well qualified as the best-qualified white male applicant for the job sought; and finally it confuses contract rights with property rights.

■ The due process clauses of the Fifth and Fourteenth Amendments do not entitle a person to a federal remedy for every breach of contract by a state or federal agency. See *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir.1983), and cases cited there; *Jett v. Dallas Independent School District*, 798 F.2d 748, 754 n. 3 (5th Cir.1986). If they did, every breach of every public contract would be actionable in federal court. What is true is that a property right (or what the Supreme Court considers to be a property right for purposes of the due process clauses of the Fifth and Fourteenth Amendments) often is created by contract. A tenured professor in a public university has a Fourteenth Amendment property right in his job; the right is created by his tenure contract with the university. Thus, unless every breach of every public contract is to be actionable as a violation of constitutional rights, it is necessary to distinguish between "mere" contract rights and property rights created by contracts.

The problem is placed in focus by this court's decision in *Vail v. Board of Education of Paris Union School District No. 95*, 706 F.2d 1435 (7th Cir.1983), aff'd by an equally divided Court without opinion, 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984). A school district had fired a coach in alleged violation of a one-year implied contract—a job right falling far short of tenure as that term is ordinarily understood. The question whether this job right was a property right divided both this court and (one assumes) the Supreme Court; fortunately we need not revisit it today, as there are two grounds on which to distinguish *Vail*.

█ The first is that there is no suggestion that the appointment which Yatvin sought was a tenure appointment even in the attenuated sense involved in *Vail*: that is, appointment under a contract as distinguished from employment at will. Had she gotten the appointment and been fired the next day, she could not have complained of a deprivation of property; no more should she be allowed to complain that the failure to appoint her deprived her of property, even if the failure was due to a breach of contract. She claims entitlement to consideration for a job that is itself not property in the constitutional sense; and the interest in being considered for a job is even more attenuated than the interest in the job.

█ Second, the right conferred by the affirmative action plan was too contingent to count as property, which in the constitutional setting is "what is securely and durably yours under state (or ... federal) law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983). The affirmative action "contract" (if that is how we should view it) gave Yatvin merely an enforceable expectation of favorable consideration should she apply for a different job from the one she had and turn out to be as qualified as the most qualified competing applicant. That expectation was too exiguous to count as property under the due process clauses, given the inherent uncertainty whether she could meet the condition (that she be no less qualified than the best of her rivals). See *Bigby v. City of Chicago*, 766 F.2d 1053 (7th Cir.1985). The plaintiff in *Vail* had a contractual entitlement, short term though it was, to a job. The plaintiff in *Goldberg v. Kelly*, 397 U.S. 254, 261–62, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970), had an entitlement to welfare benefits contingent only on his satisfying clearly specified criteria of financial need. But the plaintiff in the present case (as in *Bigby*) is complaining about conduct that impaired a noncontractual expectation of a job, since even if the affirmative action plan created a contractual right, it was not a right to the job itself. To count as a deprivation of property under the Constitution, a breach of contract must be a breach of a contractual entitlement to property, not a breach of a contractual entitlement to some extra consideration that will result in a job offer only if some other, highly uncertain condition is satisfied.

█ Yatvin's further argument, that the defendants, by saying she was denied the appointments she sought because she lacked managerial experience, stigmatized her and thus deprived of her occupational liberty, is frivolous. The ground for the denials was not stigmatizing in the sense of being defamatory or even derogatory; and it was not publicized, see *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). For both of these reasons, either of which is dispositive, and for the additional dispositive reason that the denials did not freeze her out of her chosen occupation as teacher and educational administrator, the denials did not (in the manner of a blacklist) deprive her of occupational liberty, the interest sought to be protected by the principle forbidding a public employer to fire an employee, on publicly stated grounds that are stigmatizing, without providing due process of law. See *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir.1987); *Jungels v. Pierce*, 825 F.2d 1127, 1131 (7th Cir.1987). A routine denial of a promotion to a position for which there are competing applicants is not the stuff out of which a violation of due process is made. Otherwise every such promotion (implying denial of promotion to all but one of the applicants) could spark lawsuits by the disappointed applicants.

From the rankings of applicants by the interview committee it should be apparent that Yatvin would have an uphill fight in persuading us that the jury had acted irrationally in rejecting her claim to have been denied appointment as Assistant Superintendent of Instruction on grounds of sex. The committee, which included women, which used no criteria unfairly stacked against women, and which was not shown to be prejudiced against women or biased in favor of men, ranked her a low third out of four; no member of the committee

ranked her first; three ranked her second initially but two of these later changed their minds and dropped her to third. There is no evidence that the decision to forward only the names of the two top-ranking applicants was intended to exclude the female applicant, or that Hafeman's failure to insist that additional applicants be forwarded to him for his consideration had a discriminatory motivation. Anyway Yatvin does not ask us to overturn the jury's finding that there was no discrimination.

The very dearth of evidence of discrimination might seem to strengthen rather than weaken her argument that the second rejection—the rejection of her application for the position of Director of Curriculum and Staff Development—was in retaliation for filing sex discrimination charges growing out of the first rejection. For one could argue that the more baseless the charges, the stronger the itch to retaliate against the charging party; the counterargument, however, is that the benefits from retaliating are greater if persons having valid charges can be deterred by the threat of retaliation from filing them. A more important point is that if the charges are truly baseless the employee's action in filing them may itself be a form of misconduct justifying disciplinary measures not rightly deemed retaliatory. See *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1182 (7th Cir.1982). The employer's objection might be, not to suits for discrimination, but to frivolous suits of any description—to malicious prosecution or abuse of process, in other words; and discipline motivated by such an objection would not be retaliation for the exercise of legal rights. There is no right to harass an employer with frivolous suits, and the employer is not required to tolerate the commission of torts against him by employees. Anyway Yatvin presented no evidence of retaliation, but only a conjecture that since she had implicitly accused Patterson of obtaining a job that rightfully belonged to her he must have harbored resentment against her which caused him to reject her second application.

Thus we have no basis for disturbing the district judge's ruling exonerating the defendants from the charge of retaliation. Nor can we agree with Yatvin that the judge showed disrespect for the institution of trial by jury by rejecting the jury's finding (contrary to his) of retaliation. *Wilson v. City of Aliceville*, 779 F.2d 631, 635–36 (11th Cir.1986). It was an advisory jury, see Fed.R.Civ.P. 39(c); 9 Wright & Miller, Federal Practice and Procedure § 2335 (1971)—a hallowed institution in equity cases (and Title VII cases are equity cases) but one that would cease to exist if an advisory jury's verdict had the same effect as the verdict of a regular jury. It makes no difference that the same jury was an advisory jury on some issues and the trier of fact on others.

Yatvin argues further, however, that retaliation for filing charges of sex discrimination in employment violates not only the antiretaliation provision of Title VII, 42 U.S.C. § 2000e–3(a), which does not entitle a plaintiff to trial by jury, but also the equal protection clause and the First Amendment's free speech and petition clauses, when as in this case the defendants are public agencies and officials, and 42 U.S.C. § 1981 when they are private. If she is right, she was entitled to a jury trial on her retaliation claim, since this part of her suit asks for damages.

The equal protection branch of the argument is weak. Although sex discrimination by state agencies has been held to violate the equal protection clause, retaliating against a person for filing charges of sex discrimination is not the same as discriminating against a person on grounds of sex, see *Tafoya v. Adams*, 816 F.2d 555, 558 and n. 4 (10th Cir.1987); *Irby v. Sullivan*, 737 F.2d 1418, 1430 n. 22 (5th Cir. 1984)—unless, perhaps, those are the *only* complainants against whom the employer retaliates, and even in that case the retaliation would only be evidence of discrimination, not discrimination per se. Nor is it plausible that Congress would have wanted to allow a victim of a Title VII violation to bypass the administrative procedures created by the statute (procedures as applica-

ble to retaliation claims as to any other claims under Title VII), and go directly to court, through the illogical expedient of equating discrimination against a person for filing charges of sex discrimination to sex discrimination itself. *Day v. Wayne County Board of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984). Suppose a male fellow worker had testified on Yatvin's behalf and had been punished for doing so. It would not be a case of treating him badly because he was a man; his sex would be irrelevant. It is because Yatvin filed sex discrimination charges, not because she is a woman, that she was (on her story) denied the second appointment. The groundlessness of Yatvin's charges of sex discrimination reinforces the distinction. If the defendants retaliated against her because they don't like to be harassed with baseless charges of whatever kind, and whether filed by men or by women, they would not be guilty of sex discrimination merely because in one instance the baseless charges happened to be charges of sex discrimination.

■ The contention that every act of retaliation against a person who files charges of wrongdoing with a public agency denies freedom of speech or the right to petition for redress of grievances rests on the following syllogism: litigation is a method recognized by the Supreme Court, as in *NAACP v. Button,* 371 U.S. 415, 429–31, 83 S.Ct. 328, 336–37, 9 L.Ed.2d 405 (1963), and *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), for advancing ideas and seeking redress of grievances; retaliation against one who institutes litigation (or its condition precedent in Title VII litigation, the lodging of charges with civil rights agencies) discourages litigation; therefore such retaliation invades a First Amendment right. The weakness is in the first premise, which is stated too broadly. Some litigation seeks to advance political or other ideas; litigation by the NAACP seeking to eliminate public school segregation is an example. And even when litigation has private rather than public objectives, communications designed to acquaint individuals with their legal rights are within the scope of the First Amendment. See *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 5–6, 84 S.Ct. 1113, 1116, 12 L.Ed.2d 89 (1964). But not every legal gesture—not every legal pleading—is protected by the First Amendment. See *Altman v. Hurst,* 734 F.2d 1240, 1243–44 and n. 10 (7th Cir.1984) (per curiam); cf. *Callaway v. Hafeman,* 832 F.2d 414 (7th Cir.1987). Remedies against baseless litigation do not violate the First Amendment's right to petition, *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983); nor do laws aimed at deterring "far out" suits by requiring the loser to pay the winner's legal fees, *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.,* 814 F.2d 358, 373 (7th Cir.1987).

All Yatvin sought by filing charges was to get an appointment as Assistant Superintendent of Instruction in the Madison, Wisconsin school district. She wanted to advance her career, not promote a cause. Sex discrimination is a matter of public concern; obviously debate over it is protected by the First Amendment. But so far as we can tell from the record, Yatvin doesn't want to debate sex discrimination. Necessarily, by filing suit in an area of debated legal principles Yatvin raised issues of public significance; but the marketplace of ideas would not have been constricted, the vitality of public debate diminished, or the range of ideas and opinions in our society curtailed, if fear of retaliation had caused her to refrain from filing charges of sex discrimination.

In *Greenwood v. Ross,* 778 F.2d 448, 456–57 (8th Cir.1985), the Eighth Circuit, in a brief discussion, appears to have laid down a flat rule that the "filing of an EEOC charge and a civil rights lawsuit are activities protected by the first amendment." *Id.* at 457. The court did not think it necessary to explain the basis for this conclusion because it thought that the issue had been decided by its previous decision in *Womack v. Munson,* 619 F.2d 1292, 1297 (8th Cir.1980); however, that was a Title VII case, not a case under the First Amendment, and the question whether fil-

ing a civil rights lawsuit is protected by the First Amendment was not even discussed. *Greenwood* is in any event inconsistent with our decision in *Altman*; we reject its per se rule. Most lawsuits receive little or no publicity; most are settled at an early stage; the allegations in pleadings, drafted by lawyers rather than by their clients, are generally drafted with other ends in view than promoting debate on issues of public importance. We are as reluctant to federalize the law of retaliatory dismissal (here, there was not even a dismissal) as we are to federalize the law of public contracts. Yatvin's syllogism implies that every act of retaliation against an employee who files a lawsuit is a violation of the First Amendment, because every legal pleading is on her view a contribution to the marketplace of ideas. On this view, if the retaliation is for filing a suit under the Federal Tort Claims Act, a victim who wants to complain that the retaliation violated his rights under the First Amendment need only point out that safety is as worthy a subject of public concern as job discrimination.

■ It may seem that civil rights litigation *must* raise broader issues of public concern than the routine contract, pension, and workers' compensation suits that employees bring against their employers; but this is by no means clear. The First Amendment retaliation concept applies only to public employment, since private employers are not subject to the amendment. When a public agency injures an employee, breaks its employment contract with him, or denies him a pension, and a lawsuit ensues, the pleadings and evidence in the suit are as likely to ventilate matters of public concern as when the agency discriminates against an employee. Of course the routine workmen's compensation suit is unlikely to ventilate such matters, whether the employer is public or private, but neither is a suit charging discrimination by a low-level supervisor likely to. That was not this case, but we mention it to show that not every case of alleged discrimination can be presumed to contribute to the marketplace of ideas.

■ Everyone exaggerates the importance of his or her own activity and it is therefore natural for lawyers to suppose that every legal pleading, however humble, comes trailing clouds of First Amendment glory. But this is an extreme position and we reject it. The vitality of the marketplace of ideas does not depend on the volume of litigation in the federal courts.

We need not decide when a lawsuit comes within the protection of the First Amendment. We have noted the absence of evidence that Yatvin wanted to debate issues of sex discrimination, but more important (for subjective intent is an elusive issue for judicial determination) is the absence of any attempt by Yatvin to distinguish this case from the run-of-the-mine single-plaintiff discrimination case. The lawsuit does not seek relief against pervasive or systemic misconduct by a public agency or public officials, and, unlike the NAACP's litigation against school segregation, is not part of an overall effort by the plaintiff or by persons or groups allied with her to correct allegedly unlawful practices or bring them to public attention.

■ Yatvin's First Amendment claim is foreclosed not only by *Altman* but also because not raised below with sufficient particularity, an especially serious omission if we are correct that the First Amendment status of a lawsuit depends on the particulars of the suit rather than on the bare assertion that every lawsuit (or even just every discrimination suit) is a form of speech or petition encompassed by the amendment. Yatvin did tell the district court that she was challenging the alleged retaliation on Fourteenth Amendment grounds as well as under Title VII, but she neglected to specify the nature of those grounds. The Fourteenth Amendment is a vast umbrella, and to preserve a claim under it for consideration by an appellate court you must tell the court just what spot of ground beneath the umbrella you're standing on. See *National Metalcrafters v. McNeil*, 784 F.2d 817, 825 (7th Cir.1986); *United States v. Carmel*, 801 F.2d 997, 1000 (7th Cir.1986); cf. *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073,

1080–82 (7th Cir.1987). A judge might not guess, merely from being told that the Fourteenth Amendment had been violated by retaliation for filing charges of sex discrimination, that the plaintiff was seeking to enforce rights that arise under the First Amendment and have been held applicable to the states by interpretation of the Fourteenth Amendment. Yatvin did not mention the First Amendment, or freedom of speech or petition, in the district court; it is too late to raise such a claim in this court.

AFFIRMED.