Cindy COLLINS, individually and as Special Administrator of the Estate of Candy Frederiksen, Deceased, Plaintiff,

v.

VILLAGE OF WOODRIDGE, Donald Janus, Steven List, Gerald Symonds, Duane Barr, Geoffrey Korous, Steven Herron, William Murphy, and Kathleen Rush, Defendants.

No. 95 C 6097.

United States District Court,
N.D. Illinois,
Eastern Division.

March 17, 2000.

Richard Benson Rogich, Timothy M. Richardson, Spyro J. Demakis, Scott D. McKenna, Richard B. Rogich & Associates, Ltd., Chicago, IL, for Plaintiff.

Patricia L. Argentati, Thomas James Long, Norton, Mancini, Argentati, Weiler & DeAno, Wheaton, IL, Molly A. Griffin, Tribler, Orpett & Crone, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

KENNELLY, District Judge.

On February 2, 1994, Candy Frederiksen, a newly hired police officer in training with the Woodridge Police Department, committed suicide at the police station, using a Department-issued firearm. Plaintiff Cindy Collins, Frederiksen's sister and the special administrator of her estate, claims that Frederiksen killed herself because her superior officer had made the work environment hostile to women and because of the way she was treated by other supervisory personnel in retaliation for complaining about the superior officer. Plaintiff has asserted claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, and 42 U.S.C. § 1983. Defendants—the Village of Woodridge and several Village and Department officials—have moved for summary judgment.

### FACTS

Because defendants have moved for summary judgment, we view the facts in the light most favorable to the plaintiff and draw reasonable inferences in plaintiff's favor. *E.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987).

The Woodridge Police Department hired Frederiksen as a police officer in September 1993. She was only the second woman the Department had hired as an officer. After being hired, Frederiksen attended a two month course at the Illinois State Police Academy. Her class included about 60 recruits from around Illinois, 9 of whom were women. Frederiksen graduated from the Academy. In November 1993, Woodridge Police Chief Steven List authorized Frederiksen to proceed with Woodridge's field training officer (FTO) program. Though List was aware that Frederiksen had some prob-

lems at the Academy (as did other recruits), he has testified that as far as he was concerned, the only pertinent criterion was whether she graduated.

The Department's FTO program consisted of five phases of training in the field over a period of about four months. In phases 1 through 4, the recruit worked under the direct supervision of a patrol officer who was trained and certified as an FTO. Over the course of the program, the recruit was expected to show progressively increasing job knowledge and expertise and to handle greater responsibilities and independence. The FTO evaluated the recruit daily and weekly in several performance categories.

Frederiksen began work as a trainee in the FTO program on November 21, 1993. Officer Duane Barr was assigned as her FTO for phase 1, which Frederiksen was scheduled to complete by the end of December. The scores Barr gave Frederiksen are a matter of record, but their significance and characterization is hotly disputed by the parties. It is a fair characterization that Frederiksen had mixed results in her early participation in phase 1 but seemed, in general, to have been improving. Indeed, Barr characterized her as having a good attitude and taking constructive criticism well, and he indicated that it was not uncommon for new trainees to start out slowly.

On December 12, 1993, Frederiksen sent to Chief List a written complaint. Her complaint started out by saying that as a result of an injury she had suffered while in training at the Academy, she felt that she was not "physically 100%" when she was scored on certain training exercises by the Department and wanted her medical records from her time at the Academy to be able to demonstrate this. Additionally, and more importantly for purposes of this lawsuit, Frederiksen complained about Sergeant Donald Janus, one of her commanding officers. She said that in November, Janus asked her to sign an evaluation form in blank (in other words, before it had been completed) and told her that "women are the weaker sex and do not belong in law enforcement. You will have to prove yourself to be accepted by the guys, and they will probably let your ass get kicked several times." Frederiksen reported that another new officer, Dennis Hiorns, had also been asked by Janus to sign an evaluation form in blank but had not gotten the same speech about getting his "ass kicked." She reported that she was uncomfortable with the fact that a sergeant had told her this and though she knew the job of a police officer involves "physical confrontations," she felt "uncomfortable with the Sergeant's statement, and I do have concerns regarding my safety."

In her complaint, Frederiksen also reported that on December 9, Janus told her, "I hear you still have not gotten your ass kicked yet," which led her to wonder whether she was going to be set up by other officers. Later that same evening, Frederiksen said, Janus (who had heard from Frederiksen's training officer that something seemed to be bothering her), asked her what was wrong, and when she declined to reply, he said to her, "I have a wife and two daughters, is it that kind of problem?" When Frederiksen asked what Janus meant, he said, "Is it your time of the month?" Frederiksen said in her complaint that she "resent[ed]" having to answer "sexually discriminating questions" and did not feel that this had any bearing on how well she performed on the job. She requested a meeting with Chief List.

List and Deputy Chief of Police Geoffrey Korous met with Frederiksen on December 13, 1993 to discuss her complaint. List has testified that he told Frederiksen her complaint would be investigated. He assigned Commander Carl Schnibben, Janus' direct supervisor and the officer in charge of investigations for the department, to investigate the complaint. Schnibben had been a good friend of Janus for over 20 years.

Schnibben has testified that he interviewed Janus at some length on December

14. Janus denied all of the statements attributed to him by Frederiksen except for the one regarding her "time of the month." Schnibben determined that this remark was improper but concluded that there was insufficient substantiation of Frederiksen's other claims, and he recommended that Janus receive a verbal reprimand for the "time of the month" remark. When provided with Schnibben's report, Chief List overrode his recommendation and ordered that Janus receive a written reprimand, a more severe form of discipline. Schnibben was directed to deliver the reprimand to Janus, and after doing so (in early January 1994), he resigned his position as Commander. The evidence indicates that Schnibben's disagreement with Chief List's decision played some part in his decision to resign his command post.

According to List, he told Frederiksen of the results of the investigation and assured her that she would receive appropriate back-up, and Frederiksen expressed her satisfaction with this outcome. Plaintiff disputes that this conversation took place but has no evidence directly contradicting List's statement.

Since April 1988, police personnel had been subject to Woodridge's policy prohibiting sexual harassment and discrimination. In April 1993, the Department established its own written policy prohibiting sexual harassment and discrimination, which was distributed to all personnel. The Department's policy provided that allegations of sexual harassment were to be kept confidential unless and until they were found to be valid, and the Village has stated that its policy has always been to keep such complaints confidential. There is substantial evidence, however, that the fact that Frederiksen had made a complaint against Janus became widely known within the Department shortly after she filed the complaint. Plaintiff maintains that the leak led directly to retaliation against Frederiksen.

For the week starting December 13 (the week following her December 12 complaint about Janus), Frederiksen's scores from Barr improved slightly in some areas and slipped a bit in others. However, for the first time, Frederiksen was noted in Barr's December 17 report as being "not responsive to training" in two areas, orientation skill/jurisdiction geography, and telecommunications skills. From December 16 through January 6, Frederiksen was on "light duty" because of a medical restriction relating to the injury she had suffered at the police academy. Following her return to duty in January 1994, Frederiksen's scores from Barr dropped in virtually every area, and she was now noted as being "not responsive to training" (though she presumably had not received any training during her time off) in six of the ten categories subject to scoring. In mid January, the decision was made to extend Frederiksen's participation in phase 1 of the FTO program, which Frederiksen, like all trainees, had to complete successfully in order to move to phase 2 and eventually be certified as a police officer. The following week (January 14–17), however, she showed improvement in nearly every category and received no "not responsive" marks from Barr.

After January 17, Officer Gerald Symonds, another patrol officer, took over for Barr as Frederiksen's FTO. This decision was purportedly made based on the possibility that Frederiksen had a "personality conflict" with Barr. Barr and Sergeant Steven Herron, the supervisor of the FTO program, met with Frederiksen, informed her of her performance deficiencies and of the extension of her phase 1 participation, and advised her that if she did not meet the goals of phase 1 by the end of the extension, she likely would be terminated.

Symonds was aware that Frederiksen had filed a complaint against Janus. After being assigned to serve as Frederiksen's FTO, he graded her significantly lower than Barr had in nearly every category; all of Frederiksen's stores for the period of January 19–27 were in the "not accept-. able" and "marginal" ranges. That was

the last rating that Frederiksen received prior to her suicide on February 2.

On January 27, 1994, Symonds provided Sergeant Herron with a memorandum criticizing Frederiksen's performance. He claimed that she had been unfocused, inattentive, and forgetful, and also deceitful and hostile; Symonds said that Frederiksen "may be having difficulty accepting [the] fact that she is not being rated as highly as she may feel she deserves" and "may be having trouble dealing with the stress she feels during the working day." Purportedly as a result of this, Herron and Deputy Chief Korous directed Frederiksen to meet with David Hahn, a licensed clinical social worker under contract with the Village. Frederiksen met with Hahn on January 28 and February 1. Hahn says that Frederiksen seemed the most concerned about a heart valve condition from which she said she suffered and that he does not recall her mentioning any gender-related issues. Hahn says that Frederiksen did not appear unstable, did not convey any thoughts of hopelessness, and specifically denied having any thoughts of suicide. He says that he did not believe she posed a risk to herself or others.

According to Herron, on February 1, one week before Frederiksen's extended stint in phase 1 of the FTO program was to expire, she approached him and asked for assistance with various points on which she had received poor evaluation scores. Herron says that he believed Frederiksen could successfully complete phase 1 if she followed his suggestions, and that at the end of their meeting, which lasted over two hours, Frederiksen appeared positive about the upcoming week.

The next day, just before roll call, Frederiksen shot herself in the head with her service revolver.

## DISCUSSION

### A. Title VII sexual harassment claim—Counts 1 & 2

In Counts 1 and 2 of her amended complaint, plaintiff asserts claims for gender discrimination under Title VII. Count 1 is

a claim against the Village, Frederiksen's employer; count 2 is a claim against the individual defendants. It appears that Count 2 was effectively dismissed by Judge Shadur's October 22, 1996 order, but to the extent this is unclear, the individual defendants are entitled to summary judgment on Count 2, because Frederiksen's employer is the only proper defendant under Title VII. *See Williams v. Banning,* 72 F.3d 552, 553 (7th Cir.1995). We therefore deal only with Count 1.

The Village argues that plaintiff cannot sustain a claim under Title VII for sexual harassment. Title VII's ban on gender discrimination is violated when discrimination based on gender creates a hostile or abusive working environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To be actionable, the conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 67, 106 S.Ct. 2399. The plaintiff must show that the workplace was both subjectively and objectively hostile, in other words that she actually perceived the environment as hostile or abusive and that a reasonable person would regard it as such. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The Village does not dispute, at least for purposes of its summary judgment motion, that plaintiff can meet the subjective part of the test; Frederiksen's filing of a prompt complaint concerning Janus' conduct would seem to be a sufficient basis for a jury to find that she considered the environment to be hostile to her based on her gender. Defendant argues, however, that plaintiff cannot meet the objective part of the *Harris* standard. It contends that Janus' alleged comments, assuming they were made, were isolated, and that such isolated comments cannot be deemed to create an objectively hostile working environment.

Though perhaps isolated in the sense that they were not recurring, Janus' alleged comments cannot be divorced from their context. As a police officer, Frederiksen held a position in which her safety could be at risk at any time. Like all police officers, she would depend on her partner, fellow officers, and superiors to provide assistance and backup in potentially life-threatening situations. The officer on duty has to be able to rely on the *fact* (not the mere hope or possibility) that such support will be forthcoming if and when she needs and asks for it. Seen in this light, Janus' statements to Frederiksen, though isolated, attacked the very foundations of her day-to-day existence and personal safety as a police officer. They were not simply the musings of a co-worker; they came from a supervisor and superior officer and thus reasonably could be understood by a fledgling police officer (particularly one who like Frederiksen was one of only two female officers in the Department) as carrying the weight of experience and authority. If Frederiksen's commanding officer doubted that she would receive backup, a reasonable recruit in Frederiksen's position could reasonably doubt that backup would be forthcoming. And Janus specifically tied this to the fact that Frederiksen was a woman. Indeed, his statement that Frederiksen would have to get her "ass kicked" before male officers— more or less everyone else in the Department—would accept her could be interpreted in an objective sense as creating the most hostile work environment imaginable—one in which the female recruit would believe her safety was at risk *from her fellow employees*, simply because she was a woman.

In short, Janus' alleged statements, though isolated, are sufficient to permit (though not to compel) a jury to find that the objective standard of *Harris* is met in this case: they were at least potentially physically threatening and were certainly humiliating and could unreasonably interfere with a female police recruit's work performance. See *Harris*, 510 U.S. at 23, 114 S.Ct. 367 (identifying these as factors);

*Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir.1999) (if sufficiently severe, "isolated" incidents of harassment can alter conditions of employment); *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 440 (2d Cir.1999) (single episode can qualify if sufficiently severe). A reasonable jury could find that Janus' statements altered the conditions of Frederiksen's employment and thus constituted prohibited gender discrimination.

■ The Village argues that it cannot be held liable for Janus' alleged statements and actions. Under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), in a case like this one, an employer is vicariously liable for an actionable hostile work environment created by a supervisor like Janus with authority over the plaintiff. However, the employer may raise an affirmative defense which has two elements: it exercised reasonable care to prevent and correct promptly any harassing behavior, and the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. *Id.*

■ The Village is not entitled to summary judgment, for two primary reasons. First, there are genuine issues of fact as to whether it exercised reasonable care to prevent harassing behavior. Plaintiff has offered testimony concerning earlier incidents involving Janus and other officers, as well as evidence suggesting a longstanding atmosphere of hostility and demeaning conduct toward women working at the Department. Whether or not Frederiksen was aware of this atmosphere (there is some suggestion that she was, as indicated by a comment that she allegedly made to Dr. Hanni Taylor, who conducted a "diversity" seminar at the Department in late November 1993), this evidence is admissible on the question of whether the Department and the Village made a reasonable effort to prevent gender-based harassment. Both the Village and the Department had written policies against gender-

based harassment, but by themselves the existence of these policies does not entitle the Village to summary judgment on its affirmative defense in light of the evidence suggesting that gender-based hostility and harassment may have been common, known to the Department, and allowed to continue. *See Doe v. R.R. Donnelley & Sons, Inc.*, 42 F.3d 439, 447 (7th Cir.1994) (indicating that sexually harassing atmosphere may reach a level at which supervisors can be presumed to be aware of it).

Second, there are genuine fact issues concerning whether the Department's response to Frederiksen's complaint constituted reasonable care to correct Janus' allegedly harassing behavior. Janus was reprimanded for one of his comments, and the Department concluded that it could not determine with certainty that the others had occurred. The fact that plaintiff (and perhaps even some within the Department) feel or felt that Janus should be dealt with more harshly does not make the Village's response unreasonable within the meaning of *Ellerth*, and we are not inclined to rule against defendant on this point simply because those who considered the complaint could not definitively say whether Frederiksen or Janus was telling the truth. However, the evidence strongly indicates that the Department violated its own rule regarding confidentiality with respect to Frederiksen's complaint, which became widely known throughout the Department, both among patrol officers and supervisors like Barr and Symonds. This created further opportunities for hostility and retribution, which plaintiff claims were exploited by Barr, Symonds, and perhaps others who allegedly retaliated against Frederiksen in their treatment of her. Though a jury may ultimately conclude that no actionable retaliation occurred, *see* Section C *infra*, there are genuine issues of fact on that score, making it inappropriate to grant summary judgment in the Village's favor on the question of whether it has established an affirmative defense to liability.

**B. Section 1983 sexual harassment claim—Counts 3 & 4**

In Count 4, plaintiff makes claims under 42 U.S.C. § 1983 against the Village and the individual defendants for violation of her Fourteenth Amendment right to equal protection in connection with Janus' alleged creation of a work environment hostile to her as a woman. To sustain a claim against an individual official under § 1983, the plaintiff must show that the individual was personally involved in the constitutional wrongdoing. *E.g., Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). Plaintiff has failed to make this showing as to any individual defendant other than Janus. There is nothing to indicate that any of the other defendants were even aware of Janus' encounters with Frederiksen until she complained about them, let alone that any of the others participated in Janus' alleged activity in any way, shape or form. All of the individual defendants other than Janus are entitled to summary judgment on these claims.

Janus argues that he is entitled to qualified immunity in connection with his alleged actions. The Court disagrees. The Seventh Circuit recently held in a similar context that it has been clearly established in this Circuit since at least 1986 that sexual harassment in the workplace constitutes gender discrimination violative of the equal protection clause. *Markham v. White*, 172 F.3d 486, 491 (7th Cir.1999) (citing *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986)). A fact finder may ultimately conclude that Janus's conduct did not rise to the level necessary to constitute actionable sexual harassment, but on that score there are, as we have noted, genuine fact issues that preclude the Court from holding on summary judgment that he is entitled to qualified immunity. *Id.*

Count 3 is a § 1983 claim against the Village arising from the alleged denial of Frederiksen's right to equal protection in connection with Janus' interac-

tion with her. The Village may be liable only if plaintiff can demonstrate that the Village had a policy, custom, or practice that caused the deprivation of her rights. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A longstanding or widespread practice of constitutional deprivations can suffice to establish the existence of such a policy, even where no *formal* policy exists. *See McNabola v. Chicago Transit Authority,* 10 F.3d 501, 511 (7th Cir.1993). As previously noted, plaintiff has offered evidence indicating that such a custom or practice did exist. Though defendant disputes the significance of this evidence, it will be for a jury to determine whether it is sufficient to give rise to municipal liability under *Monell.*

## C. Title VII retaliation claim—Count 6

Counts 5 and 6 assert claims based on alleged retaliation against Frederiksen for making her complaint about Janus. Count 5 is a claim under 42 U.S.C. § 1983 against the individual defendants; we will deal with that claim in the following section. Count 6 is a claim against the Village under § 1983 and Title VII. We address the Title VII claim in this section, leaving the § 1983 claim for the following section.

Under Title VII, claims of retaliation are analyzed under the familiar burden-shifting rubric of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case of retaliation, plaintiff must show that she engaged in protected expression or activity, she suffered an adverse action by her employer, and there is a causal link between the protected expression and the adverse action. *E.g., Knox v. State of Indiana,* 93 F.3d 1327, 1333 (7th Cir.1996). Once plaintiff has satisfied this burden, the defendant must articulate a legitimate non-retaliatory reason for its actions. If the defendant does so, then plaintiff bears the burden of demonstrating that defendant's reason was a pretext for retaliation. *Id.* at 1334.

It is undisputed that Frederiksen's internal complaint was sufficient to trigger Title VII's protection against retaliation. *See Hunt–Golliday v. Metropolitan Water Reclamation District,* 104 F.3d 1004, 1014 (7th Cir.1997). The Village argues, however, that plaintiff has shown no "adverse action." Though that term has been defined broadly, *see Ribando v. United Airlines, Inc.,* 200 F.3d 507, 510 (7th Cir.1999); *Knox,* 93 F.3d at 1334, the Seventh Circuit has repeatedly made it clear that "not everything that makes an employee unhappy is an actionable adverse action," *e.g., Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996). To qualify as retaliation, an adverse action must be *materially* adverse; in other words, it must be "more than 'a mere inconvenience or an alteration of job responsibilities.'" *Ribando,* 200 F.3d at 510 (quoting *Crady v. Liberty National Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)).

In a series of cases, the Seventh Circuit has held that negative job evaluations, standing alone, do not constitute adverse action sufficient to trigger Title VII. *Smart* is illustrative of these decisions. There the plaintiff, a tree surgeon trainee, claimed that after she made a complaint of sex discrimination, her supervisors began to evaluate her performance negatively; she claimed this was done in retaliation for her complaint. The issue was whether "undeserved poor evaluations can alone constitute" adverse action. 89 F.3d at 442. The court answered this question in the negative. The plaintiff could not identify any adverse consequences that had resulted from the poor evaluations—indeed, she had completed the training program on time and had become a full-fledged tree surgeon, and she had never been threatened with or put on probation. *Id.* The negative evaluations thus did not qualify as *material* adverse action. *Accord, e.g., Silk v. City of Chicago,* 194 F.3d 788, 802–03 (7th Cir.1999) (poor evaluations of police officer allegedly in retaliation for receiving an accommodation for disability were not

actionable "because he provided no evidence that any injury or adverse employment action resulted from the allegedly lower ratings."); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997) (single negative employment evaluation not identified as having any adverse effect on employee did not qualify as adverse action); *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir.1996) (no adverse action where lower rating did not reduce plaintiff's responsibilities or salary, though it may have prevented plaintiff from qualifying for a $600 discretionary bonus).

■ Taken together, these cases establish that by themselves, negative performance reviews that have no effect on the terms and conditions of the plaintiff's employment do not constitute actionable adverse action. But here there is some evidence that the reviews did have a direct and tangible effect on the terms and conditions of Frederiksen's employment—they were used as the basis to keep her in phase 1 of the FTO program. The evidence reflects that a recruit could not become a certified police officer without passing both phases 1 and 2, and that the recruit could not even get to phase 2 without first passing phase 1. The poor evaluations thus stalled Frederiksen's progress in the training program, and she was specifically threatened with termination unless her scores improved. In short, unlike in the cases relied upon by the Village, there is evidence that Frederiksen did suffer actual adverse consequences from the negative evaluations in that she was prevented from advancing to the next phase of her training, a prerequisite for certification as a police officer. Indeed, Frederiksen arguably was put on the very sort of "probation" that the court indicated in *Smart* might have made the result in that case different. *Smart*, 89 F.3d at 442.

■ The Village argues that the extension of Frederiksen's phase 1 participation was a benefit, not a detriment, in that she was permitted to stay in phase 1 rather than washing out of the program altogether. But that argument assumes that the poor evaluations Frederiksen received after December 9 were legitimate and non-discriminatory. Plaintiff's contention is that if Frederiksen had not been retaliated against in these evaluations, she would have passed out of phase 1 and into phase 2; instead she remained in a holding pattern. Based on the current record, there are genuine issues of material fact that preclude the Court from ruling as a matter of law that Frederiksen suffered no adverse action as the law defines that term.

■ The Village also argues that plaintiff has failed to establish the requisite causal link between Frederiksen's complaint and the alleged retaliation. It is true that plaintiff has no direct evidence of causation, but circumstantial proof can suffice here as elsewhere in the law. To establish a causal link, plaintiff need only establish "that the protected activity and the adverse action were not wholly unrelated." *Hunt–Golliday*, 104 F.3d at 1014. "[S]uspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination"; a pattern of criticism by supervisors following the making of a complaint can establish the existence of a causal link. *Id.* In the particular circumstances of this case, if plaintiff's circumstantial evidence of causation were limited to a claimed temporal link between her complaint and negative evaluations, we might be hard-pressed to conclude that the evidence was sufficient to require a trial: Frederiksen's evaluations following her December 12 complaint were not uniformly bad, and while they were generally worse than her pre-December 12 evaluations, there were arguably hints in the earlier scores of what was to come. However, plaintiff's evidence is not limited to a claim of a pattern of bad evaluations: she also offers evidence indicating that a male recruit being trained in the FTO program at the same time was given consistently more forgiving scores for performance arguably similar to hers. Based on the combination of these factors, the Court concludes that there is sufficient evidence

of a causal connection to give rise to a genuine issue of fact on that score.

■ Finally, the Village argues it has articulated a legitimate reason for Frederiksen's poor evaluations—her work was not up to snuff—and that plaintiff has not forwarded evidence sufficient to persuade a jury that this reason is pretextual. We disagree. Plaintiff's evidence indicating more favorable treatment of the arguably similarly-situated male recruit referenced earlier is sufficient to give rise to a genuine issue of fact on the issue of pretext; differential treatment of a similarly-situated person who is not a member of the plaintiff's gender is a proper method of attempting to prove pretext. *See, e.g., Morrow v. Wal–Mart Stores, Inc.,* 152 F.3d 559, 561 (7th Cir.1998); *Hiatt v. Rockwell International Corp.,* 26 F.3d 761, 770 (7th Cir.1994); *Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (evidence that employees situated similarly to plaintiff but outside protected class were treated more favorably is sufficient by itself to support judgment for plaintiff).

## D. Section 1983 retaliation claim—Counts 5 and 6

In Counts 5 and 6, plaintiff brings claims against the individual defendants (Count 5) and the Village (Count 6) under 42 U.S.C. § 1983 for their alleged retaliation against Frederiksen. Though the complaint alleges that the retaliation violated Frederiksen's equal protection and free speech rights, these are not true equal protection claims. Plaintiff does not contend Barr, Symonds, and the others retaliated against Frederiksen because she was a woman—or at least plaintiff has offered no evidence that this was the case. Rather, her claim is that Frederiksen suffered retaliation because she made a complaint to the Department about Janus' sexually discriminatory comments. Retaliation against a person for filing a charge of sex discrimination is

not the same as discrimination based on sex; plaintiff's § 1983 retaliation claim arises, if at all, under the First Amendment. *See Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 418–19 (7th Cir.1988).

■ Though not addressed by the parties, the fact that plaintiff's § 1983 retaliation claim arises under the free speech clause brings into play the framework established by the Supreme Court in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), for evaluating such claims.[1] Under *Connick,* "when an employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103 S.Ct. 1684.

■ Gender discrimination by persons in positions of public trust is undeniably a matter of public concern. But under *Connick,* the question is whether the "content, form and context" of the speech indicate that the employee's expression may be "fairly considered as relating to [a] matter of political, social, or other concern to the community." *Id.* at 146, 147–48, 103 S.Ct. 1684. The speaker's motivation and choice of forum are significant because without those factors, "every employment dispute involving a public agency could be considered a matter of public concern," *see Barkoo v. Melby,* 901 F.2d 613, 618 (7th Cir. 1990), exactly the result that the Supreme Court sought to avoid in *Connick. See Connick,* 461 U.S. at 148–50, 103 S.Ct. 1684. And speech not otherwise of public concern "does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be

---

1. *Stagman v. Ryan,* 176 F.3d 986, 999 (7th Cir.1999), cited by plaintiff on the issue whether § 1983 covers retaliation claims, evaluated the plaintiff's claim as a First Amendment claim and referenced the *Connick* test.

of general interest." *Id.* at 148 n. 8, 103 S.Ct. 1684.

The Court concludes that Frederiksen's complaint to the Department about Janus's conduct—the speech for which she allegedly was retaliated against—did not involve a matter of public concern. What Frederiksen sought by making her complaint was to remove what she perceived to be a hindrance to her advancement at the Department, not to promote a broader social cause. *See Yatvin,* 840 F.2d at 419. Aside from the fact that Frederiksen killed herself, this case is an unextraordinary, single-plaintiff discrimination case, and not, as in *Auriemma v. Rice,* 910 F.2d 1449 (7th Cir.1990) (*en banc*), a case involving a decision that had a broader impact to society at large or public welfare or safety. *See id.* at 1460. Because Frederiksen's complaints were personal in nature and related entirely to her own situation, they did not involve a "matter of public concern" giving rise to First Amendment protection. When a public employee speaks to matters addressing only her own employment conditions, the First Amendment does not protect her from retaliation. *Yatvin,* 840 F.2d at 419; *see also, e.g., Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993) (employee's complaint alleging sexual harassment did not involve matter of public concern, even though evidence was uncovered that the person responsible had previously harassed another employee); *Rice v. Ohio Department of Transportation,* 887 F.2d 716, 720–21 (6th Cir.1989) (retaliation for making claim of "reverse" gender discrimination not actionable under First Amendment).[2] As the Fifth Circuit noted in *Ayoub v. Texas A & M University,* 927 F.2d 834, 837 (5th Cir. 1991), "[t]his principle is especially compelling in cases where an employee's expressions are protected against retaliation un-

der Title VII of the Civil Rights Act." The Court therefore concludes that plaintiff cannot maintain a § 1983 claim for alleged retaliation. As a result, all of the individual defendants other than Janus are entitled to dismissal of the claims against them.

This eliminates the need to address in detail the parties' remaining arguments concerning plaintiff's claims of conspiracy in Counts 5 and 6. Count 5 alleges that the individual defendants conspired to retaliate against Frederiksen for her complaint against Janus; because plaintiff cannot maintain a § 1983 retaliation claim, Count 5 necessarily fails. Count 6 seeks to hold the Village liable for the retaliation under § 1983; though denominated a "conspiracy" claim, in reality it is a municipal liability claim under *Monell,* for that is the only basis under which a municipality may be held liable under § 1983. The fact that plaintiff does not have a viable underlying constitutional claim against the individual defendants requires dismissal of Count 6. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (*per curiam*).

**E. Suicide issue**

██ Defendants argue that they cannot be held liable under Title VII or § 1983 for damages resulting from Frederiksen's suicide. They rely entirely on Illinois cases holding that with limited exceptions, the suicide of a person injured by the defendant's negligence constitutes an independent supervening cause cutting off the defendant's liability. *Little v. Chicago Hoist & Body Co.,* 32 Ill.2d 156, 203 N.E.2d 902 (1965) and other Illinois decisions hold that in such a case, the supervening cause rule applies unless the injury rendered the victim bereft of reason or

---

**2.** This case is nothing like *Marshall v. Allen,* 984 F.2d 787 (7th Cir.1993), in which the court concluded that retaliation against an attorney for a public agency who had spoken to various persons inside and outside the agency in support of the claims of a group of attorneys who claimed gender discrimination

implicated the First Amendment. In that case, the underlying dispute did not involve the plaintiff, and thus he had nothing personally at stake; the Seventh Circuit concluded that that factor distinguished his case from *Yatvin* and similar decisions. Such is not the case here.

otherwise unable to control her actions. *See, e.g., Moss v. Meyer,* 117 Ill.App.3d 862, 865, 73 Ill.Dec. 304, 454 N.E.2d 48, 50–51 (1983).

Even assuming that state tort law controls under Title VII and § 1983—a point for which defendants cite no authority—in this case plaintiff's claims are for intentional wrongs, not negligence. Neither side has cited any cases addressing whether the same causation analysis applies in intentional tort cases. In fact, the rule appears to be different in such cases: the tort victim's suicide generally is not considered a supervening cause, at least where the plaintiff can demonstrate that the defendant's intentional conduct caused severe emotional distress that was a substantial factor in bringing about the suicide. *See, e.g., Mayer v. Town of Hampton,* 127 N.H. 81, 85–87, 497 A.2d 1206, 1209–11 (1985); *Clift v. Narragansett Television L.P.,* 688 A.2d 805, 812 (R.I.1996); *R.D. v. W.H.,* 875 P.2d 26, 30–31 (Wyo. 1994); *Tate v. Canonica,* 180 Cal.App.2d 898, 912, 914–15, 5 Cal.Rptr. 28, 38, 39–40 (1960). *But see Epelbaum v. Elf Atochem, North America, Inc.,* 40 F.Supp.2d 429 (E.D.Ky.1999) (Kentucky law; no indication that plaintiff argued that intentional tort cases should be treated differently).

Defendants have only addressed this issue in terms of the Illinois standard referenced earlier, arguing that Frederiksen's suicide was, as a matter of law, a supervening cause cutting off their liability. For the reasons stated above, we do not believe this standard correctly states the governing law and thus reject defendant's argument. As defendants have not addressed whether plaintiff's evidence of causation is sufficient in the event we disagree with defendants' proposed standard, that issue will be left for trial. Indeed, even were we to agree with defendants that the suicide was a supervening cause unless defendants' acts left Frederiksen so bereft of reason such that her suicide was not truly a volitional choice, defendants have failed to present more than a passing argument as to how the evidence, considered in the light most favorable to plaintiff, falls short of that standard.

That we have declined to grant defendants summary judgment on this issue does not inexorably mean that we will conclude, after hearing the evidence, that plaintiff's proof is sufficient to meet the applicable legal standard. Defendant intends to introduce evidence suggesting that Frederiksen's actions may have resulted from other factors, including her health problems, and it remains to be seen whether plaintiff will be able to introduce evidence sufficient to allow a reasonable jury to draw the necessary connection between the alleged discrimination and Frederiksen's suicide. But that is not the nature of defendants' current challenge; this will therefore remain a subject to be addressed at trial once the evidence is in.

On the subject of the trial, the potentially inflammatory nature of the evidence relating to the fact and manner of Frederiksen's suicide suggests that it may be appropriate to bifurcate the trial, holding evidence concerning damages (including the suicide) until after the jury has determined liability. We do not know whether bifurcation can be accomplished without unduly confusing or complicating the presentation of the evidence and impairing the jury's ability to understand it. Because the parties have not yet addressed this issue, the Court reserves judgment pending argument by the parties.

## CONCLUSION

For the reasons stated above, the Court grants defendants' motion for summary judgment in part and denies it in part. Summary judgment is entered in favor of all of the individual defendants on Counts 2 and 5, and in favor of all of the individual defendants other than Donald Janus on Count 4. Summary judgment is likewise entered in favor of the Village of Woodridge on the § 1983 claim contained in Count 6. Defendants' motion for summary judgment is otherwise denied.

Defendants' motion *in limine* is also denied. Evidence relating to conduct not witnessed by Frederiksen is admissible, at a minimum, on the issues of employer liability under *Ellerth* and municipal liability under *Monell* as we have indicated, and it may also be admissible as demonstrating the existence of a hostile work environment. *See Smith v. Sheahan*, 189 F.3d at 534.

The final pretrial order in this case, following this Court's format (which differs somewhat from that set forth in Local Rule 16) will be due by no later than April 21, 2000. Instructions for preparation of the final pretrial order can be found on the Court's web site at *www.ilnd.uscourts.gov/jdgpages/kennelly/ftpd.htm*. The case is set for a status hearing on March 21, 2000 at 9:30 a.m.